**UNITED STATES of America, Plaintiff,**

**and**

**The State of Texas and The City of El Paso, Intervenors,**

v.

**CHEVRON U.S.A., INC., Defendant.**

**No. EP–80–CA–265.**

United States District Court,
W.D. Texas.

Sept. 30, 1985.

Diane L. Donley, John Martin, Land & Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

John R. Carter, Jim Mathews, Asst. Attys. Gen., Austin, Tex., for intervenor—State of Tex.

Rodolfo Hernandez, David T. LaBrec, Asst. City Attys., El Paso, Tex., for intervenor—City of El Paso.

Charles R. Jones, Joseph L. Hood, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, Tex., for defendant—Chevron, U.S.A., Inc.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

This is an action by the United States to recover civil penalties under the Clean Air Act, 42 U.S.C. §§ 7401 et seq. Jurisdiction is founded upon 42 U.S.C. § 7413(b). With leave of Court, the State of Texas and the City of El Paso intervened as Plaintiffs.

Between 1967 and 1977, Chevron contracted with an unrelated corporate entity called El Paso Acid Corporation [1] to remove hydrogen sulfide ($H_2S$) from the fuel gas system at its El Paso refinery. On October 1, 1977, EPAC ceased operations. From that date until March 6, 1979, a period of more than 17 months, the hydrogen sulfide remained in the fuel gas which was burned in the furnaces and boilers of Chevron's El Paso refinery, causing greatly-increased emissions of sulfur dioxide ($SO_2$). The Plaintiffs allege that Defendant's conduct between October 1, 1977 and March 6, 1979

---

1. This corporation was known as Chemical Producers Corporation until the early 1970s, when its name was changed to El Paso Acid Corporation. To avoid confusion, the corporation will be called El Paso Acid Corporation (EPAC) throughout this opinion.

violated the Clean Air Act and the various regulations promulgated by the Administrator of the Environmental Protection Agency and the Texas Air Control Board pursuant to the Act. The Court's findings of fact and conclusions of law are incorporated in this opinion.

## A. *Description of the Refinery Process.*

Defendant Chevron, U.S.A., Inc. and its corporate predecessors have operated a petroleum refinery in El Paso, Texas since 1927. The El Paso refinery processes crude oil into various petroleum products, including gasoline, jet airplane fuel, diesel fuel, fuel oil, and asphalt. Since the crude oil being refined contains sulfur,[2] the refining process generates substantial amounts of hydrogen sulfide ($H_2S$).[3] Unless the $H_2S$ is removed from the refinery stream, it remains in the "process gas," i.e., the gas generated by the refining process which is reused to fuel the refinery's furnaces, boilers, and steam generators. If the $H_2S$ is not removed, the burning of the process gas in the refinery's boilers and furnaces creates sulfur dioxide ($SO_2$), which is discharged into the air through the refinery's stacks. Sulfur dioxide is a chemical harmful to human and animal life, and which has now become famous as the principal component of so-called "acid rain."

In 1967, Chevron contracted with the El Paso Acid Corporation for the removal of $H_2S$ from Chevron's refinery streams. EPAC performed this function in the following manner: Chevron constructed diethanol amine (DEA) absorbers on its own refinery property and ran the refinery process gas through these absorbers. The DEA and hydrogen sulfide mixed to form "rich DEA," thus removing most of the hydrogen sulfide from the gas stream. The rich DEA was piped to EPAC's facility on an adjoining tract of land, where the

$H_2S$ was removed or "stripped" from the DEA solution. EPAC then piped the "lean DEA" back to Chevron, which reabsorbed the DEA in its absorbers and burned the gas in its furnaces. This process did not remove all the $H_2S$, but it removed enough so that emissions of $SO_2$ from the refinery stacks remained relatively low.[4] EPAC recovered sulfur from the $H_2S$, and either sold the sulfur or used it in the manufacture of sulfuric acid. The primary customer for EPAC's sulfuric acid was Chevron itself, which use the acid in the refinery's alkylation plant.

## B. *Relationship with El Paso Acid Corporation.*

The second book of Kings in the Old Testament relates the story of a siege of Jerusalem by the armies of Assyria. The King of Assyria sent a messenger to the King of Judah to argue the case for surrender. He said:

> "On what do you rest this confidence of yours? ... You are relying now on Egypt, that broken reed of a staff, which will pierce the hand of any man that leans on it. Such is Pharaoh, King of Egypt to all who rely on him."[5]

This story finds its parallel in the facts of the instant case. In our scenario, however, James Keating, Chevron's El Paso Refinery Manager, plays the role of the Assyrian messenger, Chevron's San Francisco headquarters represents the King of Judah, and Egypt is the El Paso Acid Corporation.

The contractual arrangement between Chevron and El Paso Acid Corporation that seemed so ideal on paper soon appeared less than ideal in practice. By 1972, EPAC was on the verge of bankruptcy, and its ability to continue performance under the

---

2. Industry terminology distinguishes between "sweet" and "sour" crude oil. Sweet crude contains less than 0.5 percent sulfur; sour crude contains more than 0.5 percent.

3. It was estimated in 1977 that the El Paso Refinery was generating 30 tons of $H_2S$ per day of operation. (Pl.Ex. 275).

4. Chevron personnel estimated that 11 tons of $SO_2$ per day were being emitted prior to October 1, 1977.

5. 2 Kings 18:19–21 (RSV).

contract had become highly suspect. On July 27, 1972, James Keating first proposed that Chevron construct its own facilities to supplant the service provided by EPAC. In a memorandum to his supervisor, I. C. Brown (Pl.Ex. 85), Keating stated the following:

"The obvious financial distress of [EPAC] demands that we face this issue now. . . . It is difficult to judge how long [EPAC] will be able to provide service to us or what assistance from us will be required to keep them on the line. . . . Unless [EPAC] shows firm signs of substantial recovery we should proceed promptly to replace their service."

Chevron's engineers then proceeded to calculate the cost of constructing a sulfur recovery unit and acid plant on the premises of the El Paso refinery. Their estimate of the cost of construction was 5.7 million dollars (Pl.Ex. 95). In a Telex to I. C. Brown on March 30, 1973 (Pl.Ex. 94), Keating noted these estimated costs and urged his superiors to authorize the construction of new facilities. Apparently Brown was convinced; he recommended to Chevron headquarters in San Francisco that the 5.7 million dollars be appropriated and the new facilities built (Pl.Ex. 105). By March 1, 1974, however, the estimated cost of constructing the new facilities had grown to ten million dollars (Pl.Ex. 110). Suddenly the idea of renewing its contract with EPAC appeared more attractive to Chevron. By a memorandum dated July 26, 1974, R. J. Becker of Chevron's Denver regional headquarters indicated the intention to execute a new ten-year contract with EPAC (Pl.Ex. 122). A new long-term contract between Chevron and EPAC (Pl.Ex. 128) was negotiated and signed sometime in 1975, but with an effective date of December 1, 1974. Showing some foresight, Chevron retained in the new contract two important rights: (1) the right to appoint a plant manager and take over operation of EPAC's acid plant in the event of default (Pl.Ex. 128, p. 32); and (2) the right to build sulfur recovery facilities on its own refinery premises sufficient to re-

cover all or any part of the sulfur generated by the refinery (Pl.Ex. 128, p. 16).

It was not long before Keating again sounded the alarm. In a memorandum to I. C. Brown dated October 8, 1976, Keating suggested that Chevron had to "change course" with regard to the EPAC relationship (Pl.Ex. 179, p. 2). Keating insisted that Chevron was being forced either to take it upon itself to upgrade and improve the EPAC facility, or to construct its own facility (Pl.Ex. 179, p. 3). On December 14, 1976, Keating wrote to R. S. Proctor in Chevron's San Francisco headquarters that

". . . EPAC's performance has been unsatisfactory in nearly all respects, and recently has deteriorated to an intolerably low level. Acceptable levels of refinery operation are threatened. Chevron should not persist in the present arrangement, but rather, must fashion a new course." (Pl.Ex. 183, p. 1).

Keating told Procter that he favored construction of Chevron's own facilities as a solution to the problem (Pl.Ex. 183, p. 6). For the first time in this correspondence, excessive emissions of sulfur dioxide from the Chevron El Paso refinery were cited as a problem (Pl.Ex. 183, p. 4). On January 7, 1977, Keating again wrote to Proctor to inform him that the Texas Air Control Board had scheduled an administrative hearing to deal with the problem of EPAC's excessive emissions of sulfur dioxide (Pl.Ex. 185). In the same letter, Keating advised Proctor that Chevron would be forced to render immediate financial assistance to EPAC to keep it in operation a little longer. According to Keating, the alternative might be an EPAC bankruptcy, which would force Chevron to make a decision as to its future course "under crisis conditions" (Pl.Ex. 185, p. 4). In a follow-up memorandum dated January 17, 1977 (Pl.Ex. 187), Keating advocated that Chevron spend five hundred thousand dollars to upgrade the EPAC facilities and train new personnel. In recommending this expenditure, Keating conceded that "EPAC has never performed satisfactorily, and there is room for doubt that they ever will" (Pl.Ex. 187, p. 4). Keating argued, however, that the expenditure of money to upgrade the

EPAC facility would "... gain time, calm the concerned citizenry, and back off the enforcement agencies" (Pl.Ex. 187, p. 6). Keating "urgently" requested the opportunity to discuss the matter in person with Proctor and his staff in San Francisco (Pl.Ex. 187, p. 7).

Throughout 1976 and early 1977, the problem of EPAC's excessive emissions of sulfur dioxide became increasingly a matter of public and official concern (Pl.Exs. 177, 179, 185, and 187). Public complaints and Texas Air Control Board investigations resulted in the entry of Texas Air Control Board Order No. 77–2 on April 25, 1977. Among other things, this order required EPAC to improve its facilities for the removal of $H_2S$ from the Chevron refinery streams (Pl.Ex. 202). In a memorandum to P. R. Larson at Chevron's San Francisco headquarters, Keating expressed the opinion that the steps required by the Board Order would be inadequate to bring EPAC into compliance with emission requirements (Pl.Ex. 202, p. 2). In his trial testimony in this case, Keating admitted that he was well aware that a Texas Air Control Board inspection of EPAC on any date after April 25, 1977 would have revealed emission levels above those allowed by the regulations.

Additional enforcement steps against EPAC were not long in coming. On July 29, 1977, the State of Texas and the City of El Paso filed suit to enjoin EPAC from continued operation in violation of the air pollution laws and regulations. EPAC then sought to negotiate a sale of its El Paso facilities to Chevron. When the parties failed to reach a meeting of the minds, EPAC gave notice that it was terminating the contract with Chevron and ceasing El Paso operations on October 1, 1977 (Pl.Ex. 226).

C. *The EPAC Shutdown and Its Aftermath.*

EPAC carried out its threat to cease operation on October 1, 1977. Since it was no longer possible to route rich DEA to EPAC's facility for removal of the $H_2S$, Chevron bypassed its DEA absorbers and the $H_2S$ remained in the process gas. Reaction from the Texas Air·Control Board was immediate. On October 4, 1977, the Regional Director of the Texas Air Control Board issued to Chevron a notice that it had violated Rule 601 by modifying its refinery without first obtaining a permit from the Board. On October 17, 1977, Chevron filed an application for such a permit.[6]

As James Keating had both feared and prophesied, Chevron was now faced "under crisis conditions" with the problem of removal of $H_2S$ from its refinery gas system. The course of action chosen by Chevron to meet this problem was to move to the El Paso refinery a sulfur recovery unit which had previously been in operation at the Pascagoula, Mississippi refinery. Chevron applied to the Texas Air Control Board for a permit to relocate this sulfur-recovery unit on December 1, 1977, and the permit application was approved by the Board.

On January 31, 1978, the State of Texas and the City of El Paso filed suit in the 41st District Court of El Paso County, Texas to enjoin Chevron from violating Rule 201.06 of the Texas Air Control Board regarding the emissions of sulfur dioxide. The State and City's request for a temporary injunction was granted.[7]

At this time, EPAC waxed even more Egypt-like. On March 24, 1978, an attorney for EPAC wrote the Dallas regional office of the Environmental Protection Agency requesting an EPA investigation of Chevron's operation (Pl.Ex. 50). Upon receipt of this letter, the EPA commenced an investigation. On June 22, 1978, the Environmental Protection Agency issued a notice of violation (Pl.Ex. 59).

On March 6, 1979, the sulfur recovery unit (SRU) which had been relocated from

---

6. This application was never acted on by the Board and was withdrawn on February 14, 1978.

7. The decision was later affirmed on appeal. *Chevron, U.S.A., Inc. v. City of El Paso,* 593 S.W.2d 396 (Tex.Civ.App.—El Paso, 1980, no writ).

Pascagoula came on line at the El Paso refinery. With the later addition of a tail gas unit, the SRU at the El Paso refinery is more than 99 percent efficient in removing sulfur from the refinery gas. It is not disputed that Chevron is now in compliance with state and federal regulations with regard to sulfur dioxide emissions.[8]

### D. *The Law and Regulations.*

The Federal Clean Air Act, 42 U.S.C. §§ 7401 et seq. established a cooperative federal and state program to control air pollution. The Act requires the Environmental Protection Agency to establish two sets of National Ambient Air Quality Standards (NAAQS): a primary standard, designed to protect the public health, and a secondary standard, designed to protect the public welfare. Pursuant to the Act's requirements, the EPA has established primary and secondary NAAQS for sulfur dioxide. See 40 CFR §§ 50.4 and 50.5.

The Clean Air Act also requires each state to develop a State Implementation Plan (SIP) for the implementation, maintenance, and enforcement of each NAAQS in that particular state. 42 U.S.C. § 7410(a)(1). An SIP must include provisions requiring emission limitations for stationary pollution sources, schedules for compliance, and such additional measures as are necessary to insure attainment and maintenance of the national standards. 42 U.S.C. § 7410(a)(2). Each SIP must be approved by the Administrator of the Environmental Protection Agency.

The State of Texas obtained approval of its State Implementation Plan on May 31, 1972. 40 CFR §§ 52.2270 et seq. Three Texas Air Control Board rules included in the approved SIP are in issue in this case: Rule 201.06 which limits the concentration of sulfur dioxide emissions; Rule 201.09 which limits the net ground level concentration of sulfur dioxide, and Rule 601 which requires any facility which may emit air contaminants to obtain a permit before con-

structing any new facility or modifying any existing facility.

The Environmental Protection Agency is also responsible under the Clean Air Act for preserving the air quality in regions that have air quality which is no worse than the NAAQS. To accomplish this objective, the Environmental Protection Agency established the Prevention of Significant Deterioration (PSD) Program in 1974. See 40 CFR § 52.21. When the PSD regulations were promulgated, the Texas SIP was amended to include a preconstruction review program for new and modified major sources in designated categories. It is not disputed that petroleum refineries, such as Chevron's refinery in this case, were covered by these regulations. Under the PSD regulations, the Environmental Protection Agency is charged with determining in advance whether a new or modified facility will cause pollutant concentrations which would exceed the applicable ambient air quality standard or would cause a significant incremental deterioration of air quality. Furthermore, the EPA must find that the new or modified facility will employ the best available control technology in connection with its equipment to control air pollution. 40 CFR § 52.21(d)(2). The parties seeking to construct or modify a facility must submit information to EPA from which this determination can be made. 40 CFR § 52.21(d)(3). The public must be given notice and the opportunity to comment upon any proposed PSD permit. 40 CFR § 52.21(e).

At all times relevant to this case, Rule 201.06 of the Texas Air Control Board stated:

> "No person may cause, suffer, allow or permit emissions of sulfur dioxide from any liquid fuel fired steam generator, furnace or heater to exceed 440 ppm, by volume."

Between October 1, 1977 and March 6, 1979, Chevron's El Paso refinery operated several furnaces, heaters, and steam gener-

---

**8.** The complaint in the instant case originally prayed for injunctive relief. That prayer was later withdrawn, and the parties appear to con- cede that Chevron is now in compliance with the law.

ators which were fired in part by liquid fuel and in part by process gas. Since the $H_2S$ was not being removed from the process gas during this period, on numerous occasions the sulfur dioxide emissions exceeded 440 parts per million (ppm). Plaintiffs contend that a civil penalty pursuant to 42 U.S.C. § 7413(b) should be imposed for each furnace for each day of operation in which the sulfur dioxide emissions exceeded 440 ppm. Chevron contends, however, that Rule 201.06 does not apply to any of its furnaces or heaters at the El Paso refinery, because none were exclusively fueled by liquid fuel. Chevron contends that the rule should not be applied to a furnace which is fueled in part by liquid fuel and in part by gas fuel, particularly where the gas fuel, not the liquid fuel, was the actual source of the increased sulfur dioxide emissions.

■ Chevron's proposed interpretation of Rule 201.06 must be rejected for several reasons: First, the plain language of the rule itself would appear to include dual-fired furnaces. The rule prohibits any person from allowing excessive sulfur dioxide emissions "from *any* liquid fuel fired steam generator, furnace or heater...." Thus, the language of the rule itself is broad enough to include the furnaces and boilers used by Chevron at the El Paso refinery. Had the rule's drafters intended the interpretation now advanced by Chevron, they could easily have described the furnaces and heaters intended to be covered as those "solely" or "exclusively" fired by liquid fuel. The rule does not do so, however; it applies to "any" liquid-fired furnace. Since the furnaces and boilers at issue in this case did use liquid fuel in combination with other fuels, they appear to be covered by the plain language of the rule.

■ Second, it is highly significant that the Texas Air Control Board has consistently interpreted its own rule as applicable to any furnace or heater which burns liquid fuel in any amount (Pl.Exs. 6, 7, and 273). It is well settled law that an administrative agency's interpretation of its own regulations is entitled to great deference by the courts. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2782, 21 L.Ed.2d 694 (1984); *Aluminum Company of America v. Central Lincoln People's Utility District,* 467 U.S. 380, 104 S.Ct. 2472, 2480, 81 L.Ed.2d 301 (1984).

Third, Chevron itself accepted the TACB interpretation of Rule 201.06 until the litigation with the City and the State of Texas began in 1978. For example, on August 28, 1972, Keating wrote the Texas Air Control Board to advise the Board that the very furnaces at issue in this case were in compliance with Rule 201.06 with regard to their emissions of sulfur dioxide (Pl.Ex. 3). In his appropriation request to Chevron headquarters in February 1978 (Pl.Ex. 47), Keating again took the position that Rule 201.06 applied to emissions from these furnaces. Keating testified in the trial of this case that he changed his interpretation of Rule 201.06 only after conferring with Chevron's attorneys, who happen to be the same attorneys advancing the argument on behalf of Chevron in this case.

Finally, the only reported case on this subject upholds the Board's interpretation of Rule 201.06. In *Chevron, U.S.A., Inc. v. City of El Paso, supra* at 397, the Texas Court of Civil Appeals affirmed the decision of a district court that Rule 201.06 does apply to Chevron's furnaces at the El Paso refinery which are fueled in part by liquid fuel and in part by nonliquid fuel.

At all times pertinent to this case, Texas Air Control Board Rule 201.09 provided:

"No person may cause, suffer, allow or permit emissions of sulfur dioxide from a source or sources operated on a property or multiple sources operated on contiguous properties to exceed a net ground level concentration of 0.4 ppm averaged over any thirty-minute period."

Plaintiffs contend that Chevron violated Rule 201.09 on eleven different occasions between October 1, 1977 and March 6, 1979.

Texas Air Control Board Rule 601 provided in pertinent part at the time relevant to this case:

"Any person who plans to construct any new facility or to engage in the modification of any existing facility which may emit air contaminants into the air of this State must obtain a construction permit from the Texas Air Control Board before any actual work is begun on the facility."

Plaintiffs contend that the by-pass of the DEA absorbers on October 1, 1977, so that refinery gas was being burned without removal of the hydrogen sulfide from the gas, constituted "modification" of Chevron's refinery which required a permit from the Texas Air Control Board under the provisions of Rule 601.

Finally, the Plaintiffs contend that Chevron violated the 1974 PSD regulations by modifying its refinery on October 1, 1977 without submitting an application to the Environmental Protection Agency for a PSD permit.

### E. Did Chevron Violate the Regulations?

Plaintiffs have sustained their burden of proving by a preponderance of the evidence that Chevron's El Paso refinery violated Texas Air Control Board Rule 201.09, regarding ground level concentrations of $SO_2$, on eleven occasions. Monitoring by the City of El Paso detected violations on the following dates: December 1, 1977, March 20, 1978, January 29, 1979, February 1, 1979, February 14, 1979, and March 2, 1979 (Pl.Exs. 28, 49, 65 and 68). Chevron's own testing reflected violations on the following additional[9] dates: March 1, 1978, April 19, 1978, September 6, 1978, January 10, 1979, and January 24, 1979 (Pl.Ex. 67). On each of those dates, net ground level concentration of sulfur dioxide exceeded 0.4 ppm averaged over a thirty-minute period.

9. Both the City and Chevron agree that ground level concentrations of $SO_2$ exceeded the allow-

■ Plaintiffs have also sustained their burden of proving that the refinery's furnaces and boilers which were fueled at least in part by liquid fuel exceeded the allowable level of emission of sulfur dioxide (440 ppm) on a number of occasions between October 1, 1977 and March 6, 1979. Those furnaces and the numbers of days on which they exceeded allowable emissions, are as follows:

| Furnace | No. of Days |
|---|---|
| 2521 | 7 |
| 2531 | 11 |
| 2541 | 12 |
| 3201 | 11 |
| 1010 | 11 |
| 1011 | 11 |
| 1601 | 464 |
| 1602 | 464 |
| Total | 991 |

In summary, the Plaintiffs have proved by a preponderance of the evidence that Chevron violated TACB Rule 201.06 on 991 separate occasions.

■ With regard to Rule 601, it seems clear that the shutting down and by-passing of the DEA absorbers on October 1, 1977 constituted the "modification of an existing facility." Furthermore, the immediate result of this "modification" was that the hydrogen sulfide remained in the fuel gas, and the total emissions of sulfur dioxide from Chevron's El Paso refinery increased from eleven tons per day to 45 tons per day. Under Rule 601, Chevron was required to obtain a permit from the Texas Air Control Board before modifying its facility. No such permit was obtained, and Chevron proceeded to operate for 522 days without removal of the hydrogen sulfide from the refinery gas streams. Plaintiffs have sustained their burden of proving a violation of Rule 601.

■ Chevron contends, however, that the violation of Rule 601 should be excused and that no penalty should be imposed because it gave notice of a "major upset" on October 6, 1977 (Def.Ex. CK) pursuant to

able on March 2, 1979.

Rule 7 of the Texas Air Control Board. That rule provided:

"The Executive Director and the appropriate local air pollution control agency shall be notified as soon as possible of any major upset condition which causes or may cause an excessive emission that contravenes the intent of the Texas Clean Air Act and/or the Regulations of the Board."

This contention is defeated, however, by the definition of major upset contained in the rules. Rule 1.18 of the Texas Air Control Board defines "major upset" to mean:

*"Major upset.* An unscheduled occurrence or excursion of a process or operation that results in an emission of air contaminants that contravenes the Texas Air Control Board Regulations and/or the intent of the Texas Clean Air Act and is beyond immediate control, or a release that is initiated to protect life in the immediate or adjacent areas."

The shutdown of EPAC's facilities was neither "unscheduled" nor "beyond immediate control." Chevron correspondence as early as 1972 demonstrates that Chevron was aware that EPAC might be forced to shut down at any given time. Provisions were written into the December 1, 1974 contract with EPAC to give Chevron the right to take action in the event of an EPAC shutdown. At least as early as April 1977, Chevron was aware that the closing of EPAC's facilities might be imminent for one of two reasons: (1) because it might be unable to reach contractual terms with Chevron, or (2) because the City of El Paso and/or the State of Texas might close it down as a polluter. Finally, prior to September 30, 1977, EPAC gave Chevron specific notice as to the exact time it would close its facility. Chevron's "major upset" defense must be rejected.

■ The Court also finds that the Plaintiffs have sustained their burden of proving that Chevron violated the 1974 PSD regulations. Those regulations provided that the approval of the Administrator of the Environmental Protection Agency had to be obtained before certain facilities, including petroleum refineries, could be constructed or modified. Chevron argues that the actions it took on October 1, 1977 did not amount to a "modification" of its refinery. That contention must be rejected. Title 40, CFR § 52.01(d) defines "modification" as follows:

"The phrases 'modification' or 'modified source' mean any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant for which a national standard has been promulgated under Part 50 of this chapter or which results in the emission of any such pollutant not previously emitted, except that:

"(1) Routine maintenance, repair, and replacement shall not be considered a physical change, and

"(2) The following shall not be considered a change in the method of operation:

"(i) An increase in the production rate, if such increase does not exceed the operating design capacity of the source;

"(ii) An increase in the hours of operation;

"(iii) Use of an alternative fuel or raw material, if prior to the effective date of a paragraph in this part which imposes conditions on or limits modifications, the source is designed to accommodate such alternative use."

Chevron clearly changed the method of operation of its El Paso refinery on October 1, 1977, and, therefore, it made a "modification" which was subject to prior approval by the Environmental Protection Agency. Chevron neither applied for nor received a PSD permit from the Environmental Protection Agency prior to making this modification. The modification resulted in the retention of hydrogen sulfide in the fuel gas stream where it was burned in the refinery furnaces and converted into sulfur dioxide. The sulfur dioxide was then emitted into the atmosphere in quantities several times greater than those existing prior to October 1. Chevron's "modification"

clearly comes within the requirements of the rule, and the failure to apply for or obtain a PSD permit placed Chevron in violation of the rule. As in the case of Rule 601, it operated its El Paso refinery for 522 days in this modified condition with increased emissions of sulfur dioxide.

### F. *What Civil Penalties Should be Imposed?*

Title 42, U.S.C. § 7413(b) provides for the assessment against a violator of the Federal Clean Air Act of a civil penalty of not more than $25,000.00 per day of violation. The statute provides that the courts shall take into consideration in addition to other factors "the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation." Section 4.01(c) of the Texas Clean Air Act, Tex.Rev.Civ.Stat.Ann. art. 4477–5, provides for a civil penalty of not less than $50.00 nor more than $1,000.00 for each day of violation and for each act of violation. The Texas Act does not set out specific criteria for the determination of the amount of the penalty, but simply provides that penalties be assessed "as the court may deem proper."

■ The first two criteria in Section 7413(b) would point toward the imposition of a substantial penalty in this case. Chevron is a major corporation; one of the largest in the United States. Only a substantial penalty would have any economic impact or serve as any deterrent. The third criterion, i.e., the seriousness of the violation, would also call for the imposition of a substantial penalty. Chevron had many opportunities to avoid causing excessive emissions of sulfur dioxide for a seventeen-month period. As early as 1972, it foresaw the need to build its own sulfur recovery unit. It chose not to do so for purely economic reasons, i.e., the cost of construction. In the contract of December 1, 1974, Chevron reserved the right to take over the EPAC facility in the event of a shutdown. However, when the EPAC facility was actually shut down in this case, Chevron chose not to exercise this power. Chevron also had the opportunity in early 1977 to purchase the EPAC facility. The evidence shows that Chevron could have upgraded the EPAC plant to serve its needs at a cost of $951,000.00 (Pl.Ex. 205). What Chevron chose to do was to do nothing, and the results of that choice were inevitable. It was Chevron's own decision to ride a dying horse (EPAC), and then to blame the horse when it predictably fell dead.

■ Chevron's conduct between October 1, 1977 and March 6, 1979 violated both federal and state clean air laws and regulations. Civil penalties should be assessed both in favor of the United States under 42 U.S.C. § 7413(b) and in favor of the State of Texas under Tex.Rev.Civ.Stat.Ann. art. 4477–5. With respect to the eleven violations of Rule 201.09 (ground level concentration of sulfur dioxide), a civil penalty of $5,000.00 per violation should be assessed. The sum of $4,000.00 per penalty should be recovered by the United States, and $1,000.00 by the State of Texas. With respect to the 991 violations of Rule 201.06, a similar penalty of $5,000.00 per violation should be assessed. The United States should recover $4,000.00 for each violation and the State of Texas $1,000.00.

■ Chevron was required to apply to the Texas Air Control Board for a permit under Rule 601 and to the Administrator of the Environmental Protection Agency under the PSD regulations for a permit before modifying its refinery. It applied for neither permit, and operated 522 days with excessive sulfur dioxide emissions. It is appropriate in this case to assess penalties in favor of the State of Texas with respect to the Rule 601 violation, and in favor of the United States with regard to the violation of the PSD regulations. With regard to Rule 601, a penalty of $1,000.00 a day is assessed in favor of the State of Texas. With regard to the PSD regulations, a penalty of $1,000.00 a day is assessed in favor of the United States.

It is therefore ORDERED that the Plaintiff, United States of America, do have and recover judgment of and from Defendant

Chevron U.S.A., Inc. for civil penalties in the total amount of $4,530,000.00.

It is further ORDERED that the Plaintiff-Intervenor, State of Texas, do have and recover judgment of and from Defendant Chevron U.S.A., Inc. for civil penalties in the total amount of $1,524,000.00.

It is further ORDERED that Defendant Chevron U.S.A., Inc. pay the costs of court herein incurred.